1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Michael P. Lehmann (Cal. Bar No. 77152)
Christopher L. Lebsock (Cal. Bar. No. 184546)
Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
HAUSFELD LLP
44 Montgomery Street
Suite 3400
San Francisco, CA 94104
Tel: (415) 633-1908
Fax: (415) 358-4980
Email: mlehmann@hausfeldllp.com
        clebsock@hausfeldllp.com
        abailey@hausfeldllp.com

*Attorneys for Plaintiff*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| TRUMBULL INDUSTRIES, INC., on behalf of itself and all others similarly situated,<br><br>             Plaintiffs,<br><br>     vs.<br><br><br>AB&I FOUNDRY, TYLER PIPE COMPANY, MCWANE, INC., CHARLOTTE PIPE AND FOUNDRY COMPANY, and RANDOLPH HOLDING COMPANY,<br><br>            Defendants. | Case No.:<br><br>**<u>CLASS ACTION</u>**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS**<br><br>**(JURY TRIAL DEMANDED)** |

Plaintiff Trumbull Industries, Inc. brings this action both individually and on behalf of a Class of all others similarly situated (the "Class," as defined below), who purchased cast iron soil pipe and fittings ("CISP") directly from Defendants beginning at least as early as January 1, 2006 and continuing through the present (the "Class Period"). Upon personal knowledge as to the facts pertaining to itself and upon information and belief as to all other matters, Plaintiff brings this class action for damages and other relief pursuant to the federal antitrust laws, and demands a trial by jury.

## INTRODUCTION

1. This proposed class action alleges that Defendants AB&I Foundry, Tyler Pipe Company and McWane, Inc. (collectively, "McWane"), and Defendants Charlotte Pipe and Foundry Company and Randolph Holding Company LLC (collectively, "Charlotte Pipe") engaged in a conspiracy to fix, raise, maintain and/or stabilize the prices of CISP sold by Defendants in the United States directly to Plaintiff and other Class members in violation of the federal antitrust laws. McWane and Charlotte Pipe are collectively referred to herein as "Defendants."

2. This complaint alleges a conspiracy to fix the prices of CISP that began at least as early as January 1, 2006 and continues through the present. As described in more detail herein, Plaintiff alleges Defendants engaged in various collusive acts intended to fix the prices at which they sell CISP.

3. Plaintiff also alleges that Charlotte Pipe undertook steps to facilitate and ensure the success and further effectuate the price-fixing conspiracy by acquiring and liquidating the CISP business of Star Pipe Products, Ltd. ("Star Pipe"). In July of 2010, Charlotte Pipe, through its subsidiary Randolph Holding Company, LLC, purchased the CISP assets of Star Pipe, a competitor whose entrance in the CISP market in 2007 threatened the effectiveness of Defendants' price-fixing conspiracy. The purchase agreement included non-compete and confidentiality clauses for many of Star Pipe's top executives.

4. Following the purchase, Charlotte Pipe destroyed Star Pipe's CISP assets and shuttered its CISP foundries. Charlotte Pipe previously had engaged in similar conduct to

1    eliminate other actual and potential competitors, and to maintain and further the

2    Defendants' implementation of their price-fixing conspiracy by purchasing smaller competitors

3    in the CISP market with the purpose of selling off their assets and closing their operations.

4        5.       Charlotte Pipe's purchase of Star Pipe's CISP business resulted in substantially

5    decreased competition in the CISP market and facilitated the ability of Charlotte Pipe and

6    McWane to continue to fix CISP prices.

7        6.       The United States Federal Trade Commission ("FTC") launched an

8    investigation into Charlotte Pipe's acquisition of Star Pipe's CISP business, resulting in the

9    FTC's filing of an administrative complaint on April 2, 2013 against Charlotte Pipe.

10    Subsequently, Charlotte Pipe entered into a Consent Agreement prohibiting it from

11    engaging in certain anti-competitive activities. In this Complaint, reference will be made to the

12    FTC's "Analysis To Aid Public Comment" ("Analysis") concerning that consent decree

13        7.       Defendants and their predecessors are the only significant sellers and

14    manufacturers of CISP in the United States. As reflected in the 2006 edition of the *Cast Iron*

15    *Soil Pipe & Fittings Handbook* ("*Handbook*"), disseminated by the Cast Iron Soil Pipe Institute

16    ("CISPI"), an industry trade association, Defendants (the two divisions of McWane--AB&I

17    Foundry and Tyler Pipe Company--and Charlotte Pipe & Foundry Company) constitute *the*

18    manufacturers of CISP. Together, McWane and Charlotte Pipe control over 90% of the market

19    for CISP.

20        8.       Defendants were able to effectuate this conspiracy in part through the CISPI.

21    Defendants are the only members of CISPI and therefore had numerous opportunities to

22    communicate and collude at CISPI events and meetings.  CISPI facilitated communications

23    and information-sharing among the Defendants about prices, customers, and other confidential,

24    commercially-sensitive information.  Defendants also participated in other industry association

25    meetings that provided the means and opportunity to conspire.  Following these conspiratorial

26    discussions at trade association meetings, Defendants would announce identical price

27    increases, typically in the autumn to become effective the following January.

28        9.       Defendants took steps to conceal affirmatively their conspiracy, including

communications with customers falsely providing market based reasons for their price increases. These communications to customers and the public did not reveal that the true reason for the price increases was Defendants' collusion.

10. Due to the Defendants' conspiracy and actions to keep competitors out of the CISP market, prices for CISP have increased steadily since at least 2006, despite declining demand in the United States caused in part by the Great Recession of 2008-09.

11. Defendants' conduct alleged herein has unlawfully and unreasonably restrained competition. As a result of Defendants' unlawful conduct, Plaintiff and the other members of the Class have paid artificially inflated prices for CISP exceeding the amount they would have paid if a competitive market had determined the prices.

## JURISDICTION AND VENUE

12. Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), to obtain injunctive relief and recover treble damages and costs of suit, including attorneys' fees, against Defendants for the injuries that Plaintiff and the other members of the Class have suffered from Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

13. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), because this action arises under the federal antitrust laws.

14. Venue is proper in this District under 28 U.S.C. § 1391(b), (c) and (d) and Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15(a) and 22), because, during the Class Period, Defendants resided, transacted business, were found, or had agents within this District, and a portion of the affected interstate trade and commerce discussed below was carried out in this District.

15. This Court has personal jurisdiction over each Defendant because each Defendant: (a) transacted business throughout the United States, including in this District; (b) sold CISP throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; or (d) committed one or more overt acts in

furtherance of their illegal price-fixing scheme and acquisition in the United States. In addition, the conspiracies and illegal acquisition alleged below were directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## PARTIES

16.     Plaintiff Trumbull Industries, Inc. ("Trumbull") is an Ohio corporation with its principal place of business at 400 Dietz Road NE in Warren, Ohio  44482.  Trumbull is a wholesale distributor of plumbing, heating and air conditioning products.  Trumbull purchased CISP directly from one or more Defendants during the Class Period.

17.     Defendant McWane, Inc. is a Delaware corporation with its principal place of business located at 1201 Vanderbilt Road, Birmingham, Alabama 35234.

18.     Defendant AB&I Foundry ("AB&I") is a division of McWane, Inc., with its principal place of business located at 7825 San Leandro Street, Oakland, California 94621. AB&I was acquired by McWane, Inc. in late 2006, and since that time, AB&I has been a division of and controlled by McWane, Inc.

19.     Defendant Tyler Pipe Company ("Tyler Pipe") is a division of McWane, Inc., with its principal place of business located at 11910 County Road 492, Tyler, Texas 75706. Tyler Pipe operates a major distribution center located in Oakland, California. At all relevant times, Tyler Pipe has been a division of and owned and controlled by McWane, Inc.

20.     Defendant Charlotte Pipe and Foundry Company is a North Carolina corporation with its principal place of business located at 2109 Randolph Road, Charlotte, NC 28207.

21.     Defendant Randolph Holding Company, LLC is a wholly-owned subsidiary of Charlotte Pipe and is a limited liability company organized, existing, and doing business under and by virtue of the laws of the State of Delaware with its principal place of business located at 2109 Randolph Road, Charlotte, NC 28207.

## AGENTS AND CO-CONSPIRATORS

22.     The acts of Defendants alleged in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the

management and operation of Defendants' businesses or affairs.

23.     Various persons or firms not named as Defendants, including Star Pipe, have participated as co-conspirators in the violations alleged herein. In order to participate in the conduct charged and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies and have performed acts and made statements in furtherance thereof.

24.     Whenever in this Complaint reference is made to any act, deed, or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or representatives while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

## INTERSTATE TRADE AND COMMERCE

25.     The activities of the Defendants that are the subject of this action were within the flow of, and had a substantial effect on, the interstate commerce of the United States, including in this District.

26.     During the Class Period, Defendants manufactured, sold and shipped CISP in a continuous and uninterrupted flow of interstate commerce.  The price-fixing conspiracy and other anticompetitive conduct in which the Defendants participated had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

## RELEVANT MARKETS

27.     The relevant product market for purposes of this Complaint is the market for the sale of CISP for use in commercial, industrial, and multi-story residential buildings in the United States.

28.     The relevant geographic market for purposes of this Complaint is the United States.

## FACTUAL ALLEGATIONS

## Cast Iron Soil Pipe and Fittings

29.     CISP products are components of pipeline systems.  The *Handook* describes the

1  many uses of CISP:

2        Cast iron soil pipe and fittings are used primarily in building construction
3        for sanitary and storm drain, waste, and vent piping applications. The
        product is installed in residential construction, hospitals, schools, and in
4        commercial and industrial structures. For this reason, the pattern of cast
        iron soil pipe shipments and sales is directly related to the pattern of
5        building/construction activity.

6        In buildings, the principal assembly of this piping is installed within the
7        partitions and serves the tub, lavatory, and water closet fixtures. The main
        line in this assembly is the cast iron soil stack, which runs vertically from
8        the building drain up through the structure and through the roof. Waste
9        lines are connected to this main soil stack, and vent lines may also be tied
        in at a point above the highest fixture. In some installations vent lines are
10        connected to a separate vent stack, which acts as the main source of air to
        and from the roof.
11
12        The building or house drain, the lowest horizontal piping in the drainage
        system, receives the discharge from the soil, waste, and drainage pipes
13        from within the building and conveys the discharge to the building sewer.
        The building or house sewer, in turn, conveys the discharge
14        away from the structure, to the point prescribed by the local plumbing
15        code for joining to the city sewer, septic tank, or other means of disposal.

16        An additional use for cast iron soil pipe and fittings in building
17        construction is for storm drainage from roofs, yards, areaways, and courts.
        It is used for collecting subsoil drains, which are placed around the
18        structure's foundation for connection into a storm drainage system or into
19        a sump. It is also used for roof leaders, particularly when these are placed
        within the building, pipe space, or other area. Extensive use is made of soil
20        pipe for storm drainage on high-rise buildings, where large setbacks
        accumulate substantial amounts of rainwater and snow. At present,
21        cast iron soil pipe is used in high- rise building construction for drain,
        waste, vent, and sewer purposes without concern for building height and
22        is, in fact, the preferred material.

23        30.     Manufacturers of CISP sell to companies that use CISP in construction projects

24  or to independent wholesale distributors (like Plaintiff) or stocking houses for resale to end

25  users. The end users of CISP are typically construction firms, mechanical engineering firms,

26  plumbers, and developers.

27        31.     CISP is manufactured predominantly from cast iron.  Cast iron is a generic term

28  that refers to a series of alloys primarily made of iron, carbon, and silicon.  Cast iron may also

contain trace amounts of other materials such as manganese, sulfur, and phosphorous.

32. CISP is manufactured in a foundry. Casting of CISP is a highly mechanized process and incorporates latest advances in foundry technology. The modern CISP foundry consists of six major sections or departments: (1) radiation screening; (2) the storage yard for raw materials; (3) the melting area; (4) the molding and casting area where CISP is manufactured; (5) the cleaning department where the CISP is cleaned, coated and prepared for storage or shipment; and (6) the storage and shipping area for finished products.

33. CISP has numerous characteristics that make it particularly well-suited for drain, waste, vent, and sewer plumbing applications. These include unique resistance to corrosion and abrasion. Over 95 percent of the soils in the United States are non-corrosive to cast iron. CISP is also highly resistant to abrasion from sand, gravel, glass particles, garbage disposal residue and other debris. Numerous state and local building codes require the use of CISP for certain types of construction. The following picture, taken from Defendant Charlotte Pipe's website, provides an illustration of their CISP:



34. As reflected in the *Handbook*, there are generally two methods for joining CISP. The first type is called "Hub and Spigot" and the second is called "Hubless."

35. Hub and Spigot pipe and fittings have "hubs" into which the spigot (plain end) of the pipe or fitting is inserted. The joint is sealed with a rubber compression gasket or molten lead and oakum. Hub and Spigot CISP are available in two classes or thicknesses, classified as Service (SV) and Extra Heavy (XH).

36. Hubless CISP is also referred to in the plumbing industry as "No-Hub." Hubless

CISP are simply pipe and fittings manufactured without a hub. The method of joining No-Hub pipe and fittings uses a metallic shielded hubless coupling that slips over the plain ends of the pipe and fittings and is tightened to seal the joint. Hubless CISP are made in only one class or thickness. There are many varied configurations of Hubless CISP for both pipe and fittings ranging in size from 1½ inches to 15 inches. The following picture, taken from the *Handbook* illustrates a hubless coupling:



37.    CISP fittings include castings of various shapes and sizes used in conjunction with iron soil pipe in the sanitary and storm drain, waste, and vent piping used in buildings. These fittings include various designs and sizes, consisting of bends, tees, wyes, traps, drains, and other special fittings. The variety of fittings is attributable to the many types and sizes of buildings and the variety of requirements of state and regional plumbing codes.

## The CISP Industry

38.    CISP was first used in the United States at the beginning of the 19th century, when it was imported from England and Scotland to replace the wooden systems in use principally in the northeastern part of the county. The manufacture of CISP emerged as a distinct industrial activity in the United States in the 1890's with 37 foundries devoted to soil pipe production existing in 13 states by 1898.

39.    By 1922, the nation's production of CISP had reached 357,000 net tons.

According to the U.S. Department of Commerce an all-time high in tonnage shipments was reached in 1972. In recent years, the production of CISP has fluctuated with demand and periods of new construction.

40.     According to the *Handbook*, of the total CISP production, fifty-nine percent (59%) of the pipe produced is 3-inch and 4-inch in circumference, twenty-five percent (25%) is 1 1⁄2-inch and 2-inch, and sixteen percent (16%) is 5-inch and over.  It is estimated that fittings constitute approximately twenty two percent (22%) to twenty five percent (25%) of the total tonnage of CISP combined production.

41.     The industry requires efficient distribution networks and large inventories to provide ready availability of CISP products.  CISP is delivered to purchasers across the United States and nearly all of the industry's CISP is shipped directly from the manufacturer by truck.

42.     According to United States Census data, the annual value of CISP shipped in the U.S. between 2004 and 2011 was between $350,000,000 and $450,000,000. A private industry analysis has estimated that overall cast iron pipe demand will be at the level of $2.9 billion by 2014.

## The Defendants' CISP Businesses

43.     AB&I began operations in the months following the San Francisco earthquake of 1906.  AB&I began CISP manufacturing to meet the demands of the housing boom of the late 1940's and early 1950's, and CISP has developed into its main product line.  The AB&I website touts AB&I as a major nationwide manufacturer of CISP and the "largest manufacturer of cast iron soil pipe and fittings in the Western United States."

44.     Tyler Pipe was founded in 1935 as a manufacturer of cast iron pipe, fittings, couplings and gaskets, named after its home base of Tyler, Texas.  In addition to a foundry located in Tyler, Tyler Pipe operates or has operated manufacturing facilities in Marshfield, Missouri and distribution centers in Macungie, Pennsylvania, and in City of Industry, California and Oakland, California.

45.     Both AB&I and Tyler Pipe are divisions of McWane. McWane has been engaged in the cast iron pipe and fittings manufacturing business since 1904. McWane acquired

Tyler Pipe in 1995 and AB&I in 2006.  In 2007, pursuant to a corporate reorganization, McWane consolidated its CISP business, putting all CISP operations together according to product lines.

46.     Charlotte Pipe was founded and began manufacturing and selling CISP in Charlotte, North Carolina in 1901.  Charlotte Pipe states it produces Service, Extra Heavy and No-Hub CISP for drain and vent applications and a complete line of double-hub pipe.  Charlotte Pipe's cast iron foundry is "one of the largest and most modern facilities of its kind in the nation."

## Market Characteristics Conducive to Collusion

47.     Certain factors support the existence of a cartel.  These factors include a high degree of industry concentration, high barriers to entry, product interchangeability, and demand inelasticity.  Publicly available data on the CISP industry supports the existence of a price-fixing cartel. Indeed, one economist has noted that historically, the cast iron pipe industry has exhibited all of the characteristics that Circuit Judge Richard Posner has identified as being conducive to collusion.

## High Degree of Industry Concentration

48.     There are only three producers of CISP in the United States.  These are Charlotte Pipe, AB&I, and Tyler Pipe. As noted above, both Tyler Pipe and AB&I are divisions of McWane, so the industry essentially functions as a duopoly.

49.     McWane and Charlotte Pipe together account for over 90% of the market for CISP.  The FTC Analysis has described the industry as "highly concentrated" noting that McWane and Charlotte Pipe were selling "in excess of ninety percent of the CISP products in the United States."  The FTC Analysis also indicated that the exit of Star Pipe from the market "substantially increased the level of concentration in the relevant market[]."

50.     In fact, because the CISP industry is so highly concentrated, in 2007 and again in 2009 the United States Census withheld reporting of CISP data because of the paucity of producers.

**High Barriers to Entry**

51.     The presence of high barriers to entry facilitates a collusive arrangement by excluding potential competitors.  There are significant barriers to entry and expansion to new entrants to the CISP market.

52.     First, there are substantial costs associated with building or acquiring a foundry, and with purchasing the specialty manufacturing tools that are necessary to produce CISP.  The existence of these high cost barriers is demonstrated by the fact that Star Pipe's CISP assets acquired by Charlotte Pipe, while constituting a very small percentage of the overall market, still sold for $19 million.

53.     Second, a new entrant would have to develop relationships with both plumbing distributors and end-users and develop a network for the distribution of its CISP products.

54.     Finally, for a manufacturer to successfully enter the market it must be able to produce both the most commonly requested CISP, and also less common types of CISP, in both Hub and Spigot and Non-Hub designs, and the accompanying fittings, in order to offer a full line of CISP products to customers.

55.     The FTC Analysis noted that there was no likelihood of new entry that would deter the anticompetitive effects of Charlotte Pipe's acquisition of Star Pipe's CISP assets.

**Product Interchangeablility**

56.     When products offered by different suppliers are viewed as interchangeable by the purchasers, it is easier to agree on a single price for the product in question and it is easier to effectively monitor those prices.  Thus, when a product is viewed as a "commodity" interchangeable with other products in the market, it is easier to form and sustain a cartel.

57.     The economist mentioned above described cast iron pipe as a "pure" commodity and Defendants' products are homogenous resulting from the fact that they are produced to pursuant to industry-wide standards. Because all CISP is standardized and must meet strict American Society for Testing and Materials requirements, manufacturers of CISP compete mainly on price. This product homogeneity enhanced Defendants' ability to collude on prices and to detect deviations from those collusively set prices. The CISPI touts on its website how its

members have successfully standardized CISP products.

**Demand Inelasticity**

58.     If a given change in price triggers a smaller proportionate change in the quantity demanded, then the demand for the good or service is said to be inelastic.  Where demand for a product is inelastic, increases in price result in limited declines in quantity sold or consumed in the market.

59.     Demand for CISP is inelastic because, as noted in the *Handbook*, there is no functional substitute for CISP. As the FTC noted in its *Analysis*, plastic products, such as PVC or ABS pipe, are not a viable substitute for CISP for the reason that CISP has important properties that are not present in plastic pipe, including unique acoustical characteristics, performance durability and high crush strength, resistance to corrosion and abrasion, the ability to withstand extreme temperatures, and non-combustibility.  Tests of CISP for these properties reveal its superior characteristics as a material for drain, waste, vent and sewer piping.

60.     CISP is known for its quiet operation.  It has acoustical characteristics more effective in reducing plumbing noise than other materials.  Studies have shown that due to its dense molecular structure and rubber gasket joint, CISP is 750 percent more effective in reducing plumbing noise than substitute materials.

61.     Also, unlike other materials, cast iron has high crush strength suitable for under-foundation installation and exhibits resistance to abrasion from tree roots, penetration by rodents, and failure because of ground shifts.   Accordingly, unlike plastic pipe, no special bedding is required to support CISP.

62.     The thermal expansion and contraction of cast iron is far less than that of other pipe and fitting materials.  Accordingly, CISP failures from expansion and contraction due to extreme cold and heat are virtually impossible.  Also, CISP is noncombustible and will not burn in the event of a building fire, which is not the case with other piping materials.

63.     Ductile Iron Pipe is another product produced by plumbing product manufacturers, but it is not a substitute product for CISP.  This is because Ductile Iron Pipe is used mainly for large waterworks projects and therefore comes only in much larger sizes.  CISP

is used for drain waste and vent plumbing inside residential and commercial properties and therefore is manufactured in much smaller sizes.

64.     Additionally, many state and regional codes often mandate the use of CISP, as opposed to other products such as plastic pipes and fittings. As a result, there is no alternative to use of CISP in areas covered by such codes.

### Defendants Had Many Opportunities to Collude Through CISPI and Other Trade Associations

65.     Defendants and its affiliated entities comprise the only members of the CISPI. CISPI was organized in 1949 by the leading American CISP manufacturers for the goal of aiding and improving the plumbing industry. At its creation, it included 24 manufacturers. Today, the organization lists only AB&I Foundry, AB&I Service Center, Charlotte Pipe & Foundry, Tyler Coupling, Tyler Pipe and Tyler Pipe Service Center as its members. These current members of CISPI are all either Defendants, or are entities owned and controlled by Defendants, and are CISPI's sole funders and supporters.

66.     As the only members of CISPI, Defendants have had numerous opportunities to discuss pricing at CISPI events. Executives and managers from Defendants attend CISPI events together at least twice per year.

67.     Upon information and belief, CISPI is used by Defendants as a mechanism to facilitate communication and coordination of their activities, including price-fixing, maintaining their market shares, and excluding foreign competition. It is believed CISPI has been used to communicate information directly between Defendants about potential competitive threats posed by importers.

68.     Further opportunities to discuss and implement the unlawful conspiracy alleged herein were provided through the annual meetings of the American Supply Association, which counts CISP manufacturers as participants. Upon information and belief, in addition to their coordinated activities through CISPI, Defendants' executives also attended these annual American Supply Association meetings.

69.     Other trade associations, such as the American Water Works Association, held

conferences and meetings, which provided additional opportunities for Defendants to meet to discuss and set prices.

### The Defendants' Price-Fixing Conspiracy

70. As described above, Plaintiff alleges that Defendants, as the dominant suppliers in the market, have been involved in a conspiracy to fix the prices of CISP since at least 2006. Defendants' CISP list prices and rebates (which are made available on their respective websites or to customers) have been maintained in lockstep with each other during the course of the conspiracy. Their multipliers, the percentages multiplied by a given list price to arrive at the respective transaction price, have similarly been maintained in lockstep with each other.

71. Upon information and belief, it has been reported in public court filings that at some point in 2005 or 2006, the Charlotte plant manager for Charlotte Pipe indicated that Charlotte Pipe and McWane agreed to fix CISP prices at a trade association meeting.

72. Defendants often announced identical price increases very close in time to one another, and soon after that trade association meeting occurred.

73. The prices posted by Defendants for the most common sizes of CISP are all effective the first of the year and all mirror each other exactly. For example, AB&I, Tyler Pipe and Charlotte Pipe all charged the following prices for 3"x10" No-Hub Pipe for each of these year of the Class Period: $103.20 in 2006, $108.60 in 2007, $113.70 for 2009, $117.30 for 2010, $126.80 for 2011, $136.30 for 2012, and $143.50 for 2013. On information and belief, additional examples of these identical prices are reflected in the public price lists of Defendants set forth below:

| Part | Charlotte Pipe | AB&I | Tyler Pipe |
|---|---|---|---|
| **2006** | | | |
| 3"x10' No-Hub Pipe | $103.20 | $103.20 | $103.20 |
| 4" x 10' No-Hub Pipe | $134.00 | $134.00 | $134.00 |
| 3" No-Hub 1/4 Bend | $15.10 | $15.10 | $15.10 |
| 4" No-Hub 1/8 Bend | $16.00 | $16.00 | $16.00 |
| 4" x 3" Wye | $28.50 | $28.50 | $28.50 |
| 3" x10' Single Hub Pipe | $103.20 | $103.20 | $103.20 |
| **2007** | | | |

| | | | |
|---|---|---|---|
| 4" x 10' Single Hub Pipe | $134.00 | $134.00 | $134.00 |
| 3" Hub & Spigot 1/4 Bend | $23.80 | $23.80 | $23.80 |
| 4" Hub & Spigot 1/8 Bend | $29.10 | $29.10 | $29.10 |
| 3"x10' No-Hub Pipe | $108.60 | $108.60 | $108.60 |
| 4" x 10' No-Hub Pipe | $141.10 | $141.10 | $141.10 |
| 3" No-Hub 1/4 Bend | $15.90 | $15.90 | $15.90 |
| 4" No-Hub 1/8 Bend | $16.80 | $16.80 | $16.80 |
| 4" x 3" Wye | $30.00 | $30.00 | $30.00 |
| 3" x10' Single Hub Pipe | $108.60 | $108.60 | $108.60 |
| 4" x 10' Single Hub Pipe | $141.10 | $141.10 | $141.10 |
| 3" Hub & Spigot 1/4 Bend | $25.10 | $25.10 | $25.10 |
| 4" Hub & Spigot 1/8 Bend | $30.60 | $30.60 | $30.60 |
| **2009** | | | |
| 3"x10' No-Hub Pipe | $113.70 | $113.70 | $113.70 |
| 4" x 10' No-Hub Pipe | $147.70 | $147.70 | $147.70 |
| 3" No-Hub 1/4 Bend | $16.90 | $16.90 | $16.90 |
| 4" No-Hub 1/8 Bend | $17.60 | $17.60 | $17.60 |
| 4" x 3" Wye | $31.40 | $31.40 | $31.40 |
| 3" x10' Single Hub Pipe | $122.90 | $122.90 | $122.90 |
| 4" x 10' Single Hub Pipe | $159.70 | $159.70 | $159.70 |
| 3" Hub & Spigot 1/4 Bend | $28.40 | $28.40 | $28.40 |
| 4" Hub & Spigot 1/8 Bend | $34.60 | $34.60 | $34.60 |
| **2010** | | | |
| 3"x10' No-Hub Pipe | $117.30 | $117.30 | $117.30 |
| 4" x 10' No-Hub Pipe | $152.30 | $152.30 | $152.30 |
| 3" No-Hub 1/4 Bend | $17.50 | $17.50 | $17.50 |
| 4" No-Hub 1/8 Bend | $19.00 | $19.00 | $19.00 |
| 4" x 3" Wye | $32.40 | $32.40 | $32.40 |
| 3" x10' Single Hub Pipe | $129.40 | $129.40 | $129.40 |
| **2011** | | | |
| 4" x 10' Single Hub Pipe | $168.20 | $168.20 | $168.20 |
| 3" Hub & Spigot 1/4 Bend | $29.90 | $29.90 | $29.90 |
| 4" Hub & Spigot 1/8 Bend | $36.50 | $36.50 | $36.50 |
| 3"x10' No-Hub Pipe | $126.80 | $126.80 | $126.80 |
| 4" x 10' No-Hub Pipe | $164.60 | $164.60 | $164.60 |
| 3" No-Hub 1/4 Bend | $18.90 | $18.90 | $18.90 |
| 4" No-Hub 1/8 Bend | $20.50 | $20.50 | $20.50 |
| 4" x 3" Wye | $35.00 | $35.00 | $35.00 |
| 3" x10' Single Hub Pipe | $139.90 | $139.90 | $139.90 |
| 4" x 10' Single Hub Pipe | $181.80 | $181.80 | $181.80 |
| 3" Hub & Spigot 1/4 Bend | $32.30 | $32.30 | $32.30 |
| 4" Hub & Spigot 1/8 Bend | $39.50 | $39.50 | $39.50 |
| **2012** | | | |
| 3"x10' No-Hub Pipe | $136.30 | $136.30 | $136.30 |
| | $177.00 | $177.00 | $177.00 |

| 4" x 10' No-Hub Pipe | | | |
|---|---|---|---|
| 3" No-Hub 1/4 Bend | $20.30 | $20.30 | $20.30 |
| 4" No-Hub 1/8 Bend | $22.00 | $22.00 | $22.00 |
| 4" x 3" Wye | $37.60 | $37.60 | $37.60 |
| 3" x10' Single Hub Pipe | $150.40 | $150.40 | $150.40 |
| 4" x 10' Single Hub Pipe | $195.50 | $195.50 | $195.50 |
| 3" Hub & Spigot 1/4 Bend | $34.70 | $34.70 | $34.70 |
| 4" Hub & Spigot 1/8 Bend | $42.50 | $42.50 | $42.50 |
| **2013** | | | |
| 3"x10' No-Hub Pipe | $143.50 | $143.50 | $143.50 |
| 4" x 10' No-Hub Pipe | $186.30 | $186.30 | $186.30 |
| 3" No-Hub 1/4 Bend | $21.40 | $21.40 | $21.40 |
| 4" No-Hub 1/8 Bend | $23.20 | $23.20 | $23.20 |
| 4" x 3" Wye | $39.60 | $39.60 | $39.60 |
| 3" x10' Single Hub Pipe | $158.30 | $158.30 | $158.30 |
| 4" x 10' Single Hub Pipe | $205.80 | $205.80 | $205.80 |
| 3" Hub & Spigot 1/4 Bend | $36.50 | $36.50 | $36.50 |
| 4" Hub & Spigot 1/8 Bend | $44.70 | $44.70 | $44.70 |

74.     Due to the conspiracy, Defendants have been able to maintain and/or raise prices without regard to market demand.  In fact, Defendants have steadily increased prices since January 1, 2006 despite the fact that construction spending, a prime determinant of CISP demand, has fallen significantly during that time.  Available statistics regarding CISP pricing show that Defendants raised prices more than 50% between 2006 and 2013 but that construction spending fell by nearly 40% between 2006 and 2011, only rebounding slightly by 2013.

75.     Price increases cannot also be attributed to changes in the cost of manufacturing CISP during this time period.  Price increases have significantly exceeded increases in costs. The primary cost determinates for CISP—including scrap iron and natural gas—have increased at rates substantially less than the price increases set forth above.

**The Acquisition Of Star Pipe's CISP Business Furthered The Conspiracy**

76.     In 2010, Charlotte Pipe acquired and liquidated the CISP assets of one of its chief rivals in the CISP market, Star Pipe, in furtherance of the conspiracy.

77.     Prior to 2007, Star Pipe had produced and sold, among other things, ductile iron pipe fittings products.  In 2007, Star Pipe entered the CISP market.  McWane and Charlotte Pipe had significant concerns about the potential impact of Star Pipe's entry would have on

competitive conditions in the CISP market and their ability to maintain a price-fixing scheme.

78.     Between 2007 and 2010, Star Pipe's worked to expand its CISP business, competing in contested markets.  Star Pipe's strengthening market position deepened McWane and Charlotte Pipe's concerns. Star Pipe had sought membership in CISPI, the trade association controlled by Defendants, but it was not permitted to join.

79.     Star Pipe's potential growth as a competitor posed a threat to Defendants' ability to maintain their ongoing price-fixing conspiracy.  In keeping with their efforts to exclude competitors through their control of CISPI, Defendants took actions to foreclose competition engendered by Star Pipe.  Specifically, in 2010, Charlotte Pipe commenced steps to eliminate Star Pipe as a competitor in the CISP market and to maintain Defendants' price-fixing conspiracy by acquiring Star Pipe's CISP assets.

80.     On July 14, 2010, Charlotte Pipe executed a confidential Asset Purchase Agreement with Star Pipe to purchase its CISP assets for approximately $19 million.  This agreement allowed Charlotte Pipe to acquire the entirety of Star Pipe's CISP business including Star Pipe's CISP inventory, production equipment, business records and customer lists.

81.     Several Star Pipe executives received large cash bonuses following the completion of the sale of the CISP business to Charlotte Pipe.  After the acquisition, Charlotte Pipe destroyed the CISP production equipment that it acquired from Star Pipe.

82.     The parties also signed a "Confidentiality and Non-Competition Agreement" that prohibited Star Pipe and certain Star Pipe employees from competing with Charlotte Pipe in North America for a period of six years.  In addition, Star Pipe agreed to keep the acquisition confidential and to send a letter to its customers stating that it had decided to exit the CISP business.

83.     As noted in the FTC's Complaint, the Star Pipe acquisition was not the only CISP business that Charlotte Pipe had purchased from a competitor.  Charlotte Pipe acquired the CISP assets of several other potential competitors, including the Richmond Foundry in 2002, DWV Casting Company in 2004, and Matco-Norca in 2009.  Charlotte Pipe developed a pattern of purchasing a company in order to shut down production and destroy any CISP assets

when the company posed a risk of stimulating price competition in the CISP market.  The elimination of these competitors, like the activities coordinated through CISPI, has facilitated Defendants' ability to maintain and enforce their price-fixing conspiracy.

84.     In April of 2013, the FTC filed a Complaint challenging the acquisition.  The FTC Complaint alleged that Charlotte Pipe had violated Section 7 of the Clayton Act, as amended (15 U.S.C. § 18), and Section 5 of the FTC Act, as amended (15 U.S.C. § 45).  The FTC issues such complaints when it has "reason to believe that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest."

85.     The FTC's Complaint deemed the effect of Charlotte Pipe's acquisition of Star Pipe's CISP business to "have been a substantial lessening of competition in the relevant markets",  specifically finding the acquisition "eliminated actual, direct, and substantial competition between Charlotte Pipe and Star Pipe in the relevant markets; eliminated a maverick firm; increased the ability of Charlotte Pipe unilaterally to exercise market power; and prevented Star Pipe and certain Star Pipe employees from re-entering the CISP market for a period of six years."

86.     Subsequently, the FTC entered into a consent agreement with Charlotte Pipe.  The purpose of the consent agreement was to "address the anticompetitive effects resulting from Charlotte Pipe's 2010 acquisition of the cast iron soil pipe business of Star Pipe."

87.     The consent agreement required that Charlotte Pipe must notify the FTC before acquiring any additional entities engaged in the manufacture or sale of CISP products for a period of ten years.  The FTC deemed this provision "the appropriate mechanism to review all proposed acquisitions by Charlotte Pipe in the CISP market to guard against future anticompetitive transactions".  The consent agreement further mandated that Charlotte Pipe inform its customers and the public of the acquisitions of Star Pipe and its other CISP competitors because "Charlotte Pipe's acquisitions are not widely known in the CISP industry" and the order "serves to inform market participants about Charlotte Pipe's role in the exit of Star Piper, Matco-Norca, DWV, and Richmond Foundry from the CISP industry".  The consent agreement also prohibited Charlotte Pipe from enforcing the non-compete and confidentiality

clauses contained in the Star Pipe asset purchase agreement.

**FRAUDULENT CONCEALMENT**

88.     Plaintiff had no knowledge of the conspiracy alleged herein, or of any facts that might have led to the discovery thereof in the exercise of reasonable diligence, until the FTC filed its Complaint.  Accordingly, Plaintiff and members of the Class did not discover, nor could they have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until on or about April 2, 2013, when the FTC's complaint was filed.

89.     Plaintiff could not have discovered the existence of the combination and conspiracy alleged herein at an earlier date by the exercise of reasonable due diligence because of the deceptive practices and techniques of secrecy employed by the defendants and their co-conspirators to avoid detection and affirmatively conceal such violations.  The affirmative acts of Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

90.     Because Defendants' alleged conspiracy was kept secret until April 2, 2013, Plaintiff and members of the Class before that time were unaware of Defendants' unlawful conduct alleged herein, and they did not know before that time that they were paying supra competitive prices for CISP throughout the United States during the Class Period.

91.     Indeed, Defendants' conspiracy was inherently self-concealing.  CISP is not exempt from antitrust regulation, and thus, before April 2, 2013, Plaintiff reasonably considered it to be a well-regulated, competitive industry.  None of the facts or information available to Plaintiff and members of the Class prior to April 2, 2013, if investigated with reasonable diligence, could or would have led to the discovery of the conspiracy alleged herein prior to that date.  Without the benefit of discovery, it is impossible to determine the scope and extent of Defendants' and their co-conspirators' non-public meetings and communications with each other.  Defendants are alleged to have engaged in a secret conspiracy that necessarily did not give rise to facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to fix prices for CISP.  The conspiracy as herein alleged was fraudulently concealed by Defendants by various means and methods, including, but not limited to, secret meetings,

communications and agreements.  If they were memorialized in records at all, Defendants' contacts and meetings with each other were memorialized in a false and/or misleading manner in order to conceal the anticompetitive topics of discussion.  Defendants' contacts and meetings with each other were also concealed from Defendants' customers and other non-conspirators. In the context of the non-public nature surrounding Defendants' pricing practices, Defendants' acts of concealment were more than sufficient to preclude suspicion by a reasonable person that Defendants' pricing was conspiratorial.

92.     Because the alleged conspiracy was both self-concealing and affirmatively concealed by Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until on or about April 2, 2013, when the FTC complaint, and its corresponding factual allegations of anti-competitive conduct concerning the CISP industry, was first publicly disseminated.  Accordingly, a reasonable person under the circumstances would not have been alerted to investigate the legitimacy of Defendants' CISP prices before April 2, 2013.

93.     Although Defendants' price increase announcements, including in the form of new price lists, during the Class Period sometimes did not contain justifications for price increases, the announcements and price lists nevertheless constituted implicit statements that price increases were legitimate and were the result of competitive market forces.  Customers also were told that price increases were needed because raw material costs were increasing.  Such statements were false and misleading, because at times costs were not increasing and announcements and price lists never included the real reason for price increases, namely Defendants' secret conspiracy.

94.     Defendants helped conceal the conspiracy through various communications to their customers between 2007 and 2011.  On information and belief, these misleading communications included:

     a.  A May 2007 communication from AB&I to customers that "[i]t is ABI's policy to give the market as much notice as possible regarding a price increase, since

contractors and others need to plan their jobs so far in advance." This statement was misleading because advance notice of price increases was also employed to ensure that the conspirators would adhere to their price-fixing agreement and implement price increases on the same date.

b.  A March 2008 communication from AB&I to customers falsely stating its price increase was "simply a cost pass-through" because earlier increases were insufficient to cover the rise in scrap iron prices. AB&I stated that "it has become necessary to increase prices to recover these added costs of production." AB&I indicated that future price increases might be necessary to cover cost changes.

c.  A November 2009 communication from AB&I to its customers falsely stating that it was increasing prices after trying "to put off this price increase for as long as we could." AB&I represented that "[a]s in all price increases, this one came after weeks of deliberation. The disturbance such increases can cause to our valued customers is a regrettable effect, but this effect must be weighed against the impacts of NOT raising prices to stay in line with costs." ABI told customers that the "scrap iron market is a small subset of the ferrous metals market, and AB&I's scrap iron costs are inextricably linked to world steel demand. Any growth in world steel demand produces upward pressure on scrap iron prices. World demand for steel has steadily increased since April 2009, according to the World Steel Association. In fact, China produced more steel in August, 2009 than in any other month in its history. Despite falling demand in U.S. commercial construction, AB&I is experiencing rising raw material costs."

d.  A September 1, 2010 communication from Charlotte Pipe to its customers falsely stating that price increases were the result of cost increases in raw materials and operating expenses and that as a result of cost increases, prices would remain at higher levels through 2011.

e.  A September 2010 communication from AB&I to its customers falsely stating

that because of raw material cost increases it was announcing a commensurate increase in CISP prices.

    f.    A September 7, 2011 Charlotte Pipe price increase announcement falsely attributed price increases to cost increases in scrap iron and other major raw materials.

    g.    A September 20, 2011 communication from Charlotte Pipe to its customers falsely stating that it was increasing prices "[d]ue to cost increases in scrap iron and other major raw materials as well as increases in general operating expenses."

95.    As noted above, these statements are misleading because they were issued at times when costs were not increasing and they served to conceal the true reason for the increase, the Defendants' secret price fixing conspiracy. Defendants' statements justifying their price increases throughout the Class Period were designed to create, and did create, the impression that these increases were based on competitive market forces. These statements were false and misleading, and constituted affirmative and overt acts of concealment of the conspiracy, because Defendants' price increases resulted from the affirmatively and fraudulently concealed conspiracy alleged herein. As a result of this misleading conduct, Defendants' customers, including Plaintiff and members of the Class, were conditioned by experience in dealing with Defendants in what they believed to be a competitive industry to expect price increases from time to time, and to believe that this was the result of normal market forces, rather than the product of an illegal conspiracy.

96.    Defendants and their co-conspirators engaged in a successful anti-competitive conspiracy concerning CISP which they affirmatively concealed through methods including but not limited to: (a) secret communications discussing customers and prices of CISP in the United States; (b) secret meetings at trade association events to discuss and fix prices; (c) price increase announcements based on false and/or misleading reasons, including cost increases; and (d) agreements among themselves not to discuss publicly or reveal the nature and substance of the acts and communications in furtherance of their illegal conspiracy.

97.     As a result of the fraudulent concealment of the conspiracy, Plaintiff asserts the tolling of the applicable statute of limitations affecting the causes of action by Plaintiff and the members of the Class.

## **CLASS ALLEGATIONS**

98.     Plaintiff brings this action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class (the "Class") consisting of:

> All persons or entities that purchased cast iron soil pipes or cast iron soil pipe fittings in the United States directly from any of the Defendants, their subsidiaries, predecessors, or affiliates, from January 1, 2006 through the present (the "Class Period"). Excluded from the Class are Defendants, their parent companies, subsidiaries, predecessors, and affiliates, any co-conspirators, federal and state governmental entities and instrumentalities of federal and state governments.

99.     The Class is so numerous that joinder of all members is impracticable. On information and belief, hundreds, if not thousands, of individuals and entities purchased CISP from the Defendants during the Class Period.

100.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all Class members share the same injury, as they were all damaged by the actions of Defendants, which caused them to pay artificially inflated prices for CISP.

101.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class members.

102.     Plaintiff is represented by counsel who are experienced and respected in the prosecution of class action and antitrust litigation.

103.     This case presents many common questions of law and fact that will predominate over any questions that may affect individual members of the Class, such as:

> a.     Whether Defendants engaged in a conspiracy to raise, fix, stabilize, and maintain prices of CISP sold in the United States;
>
> b.     Whether Defendants agreed to allocate customers;
>
> c.     The duration and extent of the conspiracy;

d.   Whether each Defendant was a participant in any such conspiracy;

e.   Whether the actions of Defendants in so conspiring violated Sections 1 and 3 of the Sherman Act;

f.   Whether the conspiracy had the effect of artificially inflating the price of CISP sold in the United States during the Class Period;

g.   Whether Charlotte Pipe's acquisition of Star Pipe's CISP assets substantially increased concentration or decreased competition in the market for CISP, or was undertaken as a method of ensuring the continuing success of the Defendants' price-fixing conspiracy by eliminating a competitor from the market;

h.   Whether the conduct of Defendants caused injury to Class members;

i.   The measure and amount of damages incurred by the Class; and

j.   Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief.

104.   Adjudicating the claims of the Class members as a class action is superior to the alternative, because it allows for the fair and efficient adjudication of the controversy alleged in this Complaint, while avoiding the risk that the prosecution of separate actions by individual members of the Class would create inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.  This action presents no difficulties in management that would preclude its maintenance as a class action.

## CLAIM FOR RELIEF

### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)

105.   Plaintiff incorporates by reference the allegations of paragraphs 1 through 104 above.

106.   Defendants and unnamed conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 and 3 of the Sherman Act (15 U.S.C. §§ 1 and 3).

107.    Beginning at least as early as January 1, 2006, and continuing through the present, Defendants and their co-conspirators, by and through their officers, directors, employees, agents and/or other representatives, entered into and participated in a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, maintain and stabilize prices for CISP sold in the United States.

108.    Defendants engaged in anticompetitive activities, the purpose and effect of which were to artificially raise, fix, maintain, or stabilize the price of CISP sold in the United States. These activities included:

      a.    participation in meetings, conversations, and communications to discuss the price and pricing terms for the sale of CISP in the United States;

      b.    agreeing during those meetings, conversations, and communications to charge prices at specified levels, and to otherwise fix, raise, maintain, or stabilize prices of CISP sold in the United States; and

      c.    taking numerous steps, as set forth above, to implement and maintain the conspiracy.

109.    Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating the unlawful agreements described in this Complaint.

110.    The acts done by each Defendant as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

111.    Charlotte Pipe's acquisition of Star Pipe's CISP business resulted in decreased market competition and increased concentration in the market for CISP.

112.    Throughout the Class Period, Plaintiff and the other Class members purchased CISP from Defendants (or their subsidiaries or controlled affiliates) at supra-competitive prices.

113.    Defendants' conspiracy in restraint of trade had the following effects, among others:

      a.    Price competition in the CISP market has been restrained, suppressed and/or eliminated in the United States;

b.  Prices for CISP sold by Defendants have been fixed, raised, maintained and stabilized at artificially high, supra-competitive levels throughout the United States; and

c.  Plaintiff and members of the Class have been deprived of the benefits of free and open competition.

114.  As a result of Defendants' unlawful conspiracy, Plaintiff and other members of the Class have been injured in their business and property. Plaintiff and other Class members have been harmed by being forced to pay higher prices for CISP than they otherwise would have paid in the absence of Defendants' conspiracy. This injury is of the type the federal antitrust laws were designed to prevent and flows from that which makes Defendants' conduct unlawful.

115.  Accordingly, Plaintiff and the Class seek damages, to be trebled pursuant to federal antitrust law, and costs of suit, including attorneys' fees.

## PRAYER FOR RELIEF

Wherefore, Plaintiff demands judgment against Defendants as follows:

a.  Declaring this action to be a proper class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined above;

b.  That the contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants be adjudged to have violated Sections 1 and 3 of the Sherman Act (15 U.S.C. § 1 and 3);

d.  That Defendants, their subsidiaries, affiliates, successors, transferees, assignees and the respective officers, directors, partners, agents, and employees thereof and all other persons acting or claiming to act on their behalf of permanently enjoined and restrained from continuing and maintaining the conspiracy or agreement alleged herein;

e.  That judgment be entered for Plaintiff and Class members against Defendants for three times the amount of damages sustained by Plaintiff and the Class as allowed by law;

f.      That Plaintiff and the Class recover pre-judgment and post-judgment interest as permitted by law;

g.      That Plaintiff and the Class recover their costs of the suit, including attorneys' fees, as provided by law; and

h.      For such other and further relief as is just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: October 17, 2013                    Respectfully submitted,

                                           HAUSFELD LLP

                                   By:      /s/ *Christopher L. Lebsock*
                                           Michael P. Lehmann (Cal. Bar No. 77152)
                                           Christopher L. Lebsock (Cal. Bar. No. 184546)
                                           Arthur N. Bailey, Jr. (Cal. Bar No. 248460)
                                           HAUSFELD LLP
                                           44 Montgomery Street
                                           Suite 3400
                                           San Francisco, CA 94104
                                           Tel: (415) 633-1908
                                           Fax: (415) 358-4980
                                           Email: mlehmann@hausfeldllp.com
                                                   clebsock@hausfeldllp.com
                                                   abailey@hausfeldllp.com

                                           Arthur N. Bailey, Sr., Esq.
                                           ARTHUR N. BAILEY & ASSOCIATES
                                           111 West Second St., Suite 4500
                                           Jamestown, NY 14701
                                           Phone: (716) 483-3732
                                           Fax: (716) 664-2983
                                           artlaw@windstream.net

                                           *Attorneys for Plaintiff*